Our final case for today is United States v. Terry. You are not Mr. Brindley. I am not, Your Honor. Good afternoon. My name is Michael Thompson. I work for Mr. Brindley's firm and I will be presenting argument on behalf of Mr. Terry today. Mr. Terry's appeal presents two issues, Your Honor. The first is dealing with the search of his residence, which law enforcement conducted with third-party consent. There was a woman who answered the door at Mr. Terry's residence, and she was wearing a bathrobe. The law enforcement officers asked if they could enter, and the woman said they could and backed up to allow them in. That woman, Ms. Carson, did not, in fact, live at the residence. She was never asked at the time the law enforcement officers entered whether she did live there. That failure to ask and just assuming that she had authority to enter was a failure that I think is inexcusable in this case and infects the resultant search. The law enforcement officer might have thought that she lived there. It was perhaps a reasonable initial assumption to make due to the fact that she answered the door and was wearing a robe and was in the residence alone. But even if that initial assumption was reasonable, it was not reasonable to fail to verify it before conducting the search. Well, they don't really have anything at the moment of the search other than the bathrobe, right? Correct. The fact that she's there alone and wearing a bathrobe, which, again, I concede is reasonable to at least give the impression that she might live there. But would it have been enough, in your view, if they had said, who are you and can we search this? I mean, they do ask her, can we search the house? And she says, fine. How much do you think they needed to ask her? Well, I think, do you live here is not too much to ask, Your Honor. And they didn't ask even that simple question until later. Do you live there? No. Are you an overnight guest, sort of? Yes. It's not like there was some sort of… 3 a.m., right? Exigent circumstances where they had to search immediately, they could have asked simple questions like that. What's your name? Do you live here? Can we enter? They just skipped the initial questions. They did later ask, after they began the search, they asked, what's your name and where do you live? And she said that she didn't live there. At that time, they continued searching, even though the only basis for the search was her apparent authority to consent to it. At that time… So your position is she could have actually been a burglar with chutzpah who wandered in off the street, threw on a nearby bathrobe, and just decided to brazen it out with the police. Fine. Search. She certainly could have been. It's not my position that she was, certainly. But those circumstances could exist. I actually had a more nefarious thought about this. This is her ex-husband's house, right? I don't know if they were ever married, but they were formally romantically involved. They had a child in common. The ex-partner's house, and she says, fine, search away. Absolutely. There was evidence that she was there for the purpose of a child, who sometimes lived there with the child's father, the defendant appellant in this case. Counsel. Oh, sorry. You can finish your thought. And she could have been letting them in with malicious intent, knowing that she didn't have authority. That certainly could have happened. What was your question? So she comes to the door. She's in a bathrobe. She seems sleepy. Fine. It's reasonable to assume that she was an overnight guest. Do you think it's reasonable to assume that someone, I mean, maybe this is a one-night stand. Is it reasonable to assume that someone who's there for a one-night stand has the authority to give a search? I think it is not reasonable to assume that. And they didn't even get that far. They didn't ask if she'd been there all night. Maybe they thought she had been. It was perhaps reasonable for them to think she had been, but that does not convey authority to allow them into the house and to search all of the areas, including Mr. Terry's private bedroom. At what point did the call from Mr. Terry's mother come in, and she announced that that incoming call was? I think that was much later, after they had actually already identified who she was and that she did not live there. Well, was it before the consent was assigned? It was after the consent. The consent to search occurred immediately upon entry, before identification, and before they asked her where she lived. So she signed the form? She signed the form, and then they asked her to show ID and give her address while they were searching. The search was already underway after the form was signed. And am I correct that they did not know that she shared a child with Mr. Terry at the time? At the time they began the search, they did not. During the search, one officer stayed with her and was asking her questions while other officers were searching. They learned that information at the time. They discovered the child's bedroom and belongings there, of course. So do they ever verify that this incoming call is, in fact, from his mother? I don't know. I mean, the phone could ring, and a number could come up, and she could say, oh, that's his mother. You know, and it could be somebody selling carpets. Certainly that could be. If there was some additional nefarious goings on by Ms. Carson, I don't know if they took additional steps to verify. I think that occurred late enough in the overall chain of events that it's not actually that important. Because the search had already occurred. Why isn't the bathrobe the really key evidence here? That's sufficient to rule out a one-night stand. One-night stands don't come equipped with bathrobes. I'm not sure I'm willing to concede that a one-night stand person might not be wearing a bathrobe. Well, I don't know. You know, it's at least reasonable to think that there's something. Well, they did say that it was a woman's bathrobe, right? Correct. There could be a bathrobe in the house that any temporary guest might choose to put on after showering that night. But it's reasonable to hold more traditional views. Absolutely, that is a reasonable view to hold. But she actually belongs there, and it's her bathrobe. I don't think it's reasonable for police officers to assume that the people in the house are going to hold those views. This isn't the middle of the night. This is at 9 or 10 in the morning when they enter into the home. She's in a bathrobe. They don't know how long she's been there or when she put the bathrobe on or whether it was her bathrobe. They know she's there. You'd like bathrobes that are one size fits all. More or less. Fits all. It's not a form-fitting garment, Your Honor, so certainly it could have been anybody's bathrobe. And the important thing also, I think, is once they learn she does not, in fact, live there, they continue to search. They don't say, well, maybe we shouldn't actually be here under the Constitution if you don't actually live here. Well, after acquired facts aren't relevant to the consent, the apparent authority analysis. At the time of the consent, I agree. But I don't think there's any precedent that says. And you're saying it's a bad consent to start out with. I am saying it's bad. It didn't get any better. And then it gets even worse once they learn that they shouldn't be there to begin with. That could save what happened between the time of the initial apparent consent and the time they learned that. But that doesn't mean they should continue to search after that. And there's no evidence of what order they took things and found actual evidence here at value, what those items occurred before or after that was learned. So I think, at the very least, that would require further development at the district court. I don't have much time, but I'd also like to touch on the Miranda waiver issue. I think the important thing here is that what's important for a Miranda waiver is whether or not the person making the statement is knowingly and voluntarily waiving their rights. So their understanding of what those rights are is what's important. But Mr. Berghaus, I mean, how can we do anything? He chats on and on. He does. And I don't know. I couldn't see much to this. All right. Well, then maybe I won't address it very much. Other than to say I think if it matters if somebody does sign the form and that's evidence that they intend to waive it, I think their explicit refusal to sign it should also be evidence that the police officer should at least, if not completely halt, then at least ask for clarification on why they're talking if they're not waiving, if they're refusing to sign the form. And that wasn't done here. Actually, if I could reserve the remainder of my time. That would be fine. Thank you. Mr. Jodry? Good morning. Jared Jodry on behalf of the United States. We ask that this court affirm the defendant's conviction and sentence in this case. So, Mr. Jodry, I feel very uncomfortable. It seems to me the only thing you have going for you here is the bathrobe. And there are just too many explanations for why somebody might be wearing a bathrobe in the middle of the day in a house. It could be the next-door neighbor who's come over to feed the cat. It could be. Airbnb. It could be Airbnb. Somebody with no authority whatsoever over the house. And bathrobes are these nondescript sort of things. You know, it doesn't tell you it's hers or anybody else. I mean, to have a rule that the police can search any house in which a person wearing a bathrobe decides to let them in, a person apparently with no stake in the house, no incentive to say, I don't want you to search. As I say, maybe out of a grudge toward the ex-partner or maybe because what's it to me? You know, here are the police. Fine. Do whatever you want to do. It's an extremely – it goes so much further than anything else I can see. And I would think also to throw in some law, it seems inconsistent with what the Tenth Circuit said in the Koss case. I mean, you just have to go through a few more questions before you can rely on consent. I would say, first of all, we're not proposing a rule where any time someone is wearing a bathrobe, there is authority. But you don't have anything else here. Nothing. So what the district court found and what we do have here is there is some more there. This is totality of the circumstances evaluation. And what we have here isn't just at random point in time, police walk up to the door, person in bathrobe, end of story. What we have is surveillance that has begun at around 7 or 8 in the morning of this residence. DEA agents see the defendant, leave the residence with a young boy and drive that boy to school. The agents then walk up to the house after the defendant is taken into custody, knock on the door, and Ms. Carson answers the door. She answers the door wearing a bathrobe, which does evince something that's more than a mere temporary overnight guest. Why does it? I don't think at all a bathrobe evinces more than a temporary overnight guest. Although there are... There are some people who don't like to wear confining clothes. I think the point here though is it's not, I guess, incumbent on law enforcement to come up with on the spot a series of hypothetical scenarios. They just have to ask a question. What's your name? Do you live here? Those are easily answered like bam, bam. And we've said in many instances the police are entirely entitled to open up a conversation with somebody that they're talking to. They don't need warrants. They don't need all sorts of fancy things. They need to stand there on the porch and say, you know, who are you? Do you live here? What's your connection to this house? And if she says I rented it on Airbnb, that's one thing. She has a right to be there, presumably, unless they're cheating on the Airbnb stuff. If she says, you know, I spent half my time here, that's one thing. She says I dropped by at 3 a.m., which seems to be the case. Then you have another situation. Well, again. Casual, somebody who just walked in in the wee hours of the morning. Do they really have the authority to consent to a full-blown search of the house in your view? That gets back to the bathroom. Right. The issue then becomes not whether she had actual authority, but whether it was apparent. I understand. And that's where the Tenth Circuit said, no, you need to ask a little more. And this Court has held, though, that it is not incumbent on the officers to confirm actual authority where the authority of the consenting person is apparent. That's why it's your bathrobe theory. You're saying that officers are always going to see apparent authority from somebody wearing a bathrobe. No, that's not what we're saying. At this point in time, the defendant has essentially left Ms. Carson in sole possession and control of this apartment. They've just seen the defendant. This is my neighbor who maybe slips in the back way to feed the cat. This is a one-night stand. Or a one-night stand. Again, in addressing these issues, the courts have talked about established social expectations. It's not incumbent on the officers to come up with a series of hypothetical scenarios that might have been true. But I guess that's the point, right? In Matlock, the court said, Justice White writes this opinion, and he says, well, the woman was cohabitating, and she identified herself as a cohabitant, and that was a statement against interest. I mean, it would hardly be in her interest to advertise and say, I'm just cohabitating with this guy. But that was in the 70s. That was then. Yeah, that was then. This is now. Well, and I guess as a matter of social expectations, I'm not sure that it's very reasonable for officers to see a woman answer the door in a bathrobe and say, oh, she must be his wife. The question isn't whether or not they believe that it was his wife. It's whether they believe that she had mutual use of A longstanding girlfriend, then. Right, or access to and control of the apartment. Without asking a single question, that's the problem. A very small exchange between the officers and this woman could have disambiguated this. They could have left one officer on the front porch chatting with her, while the other one goes off and gets a warrant for the house, and none of this happens. You know, it's just, people are so casual at this point about where they live and where they hang out, so to speak. Maybe not you, maybe not me, but it happens. Right, and there's maybe a question of best practices versus what Does it undermine the validity of the search in this case? And again, they're there in the morning. It's not a random point in the day. It's early in the morning. It's not early in the morning. It's mid-morning. It's about 9.50 in the morning. They've seen the defendant leave with, turns out to be, her son. They walk up to the apartment, knock on the door. She answers the door in a bathrobe. When they ask to come in, without any hesitation, But that's the whole problem. You know, somebody who doesn't care about the house has no reason to tell the police they can't come in. But I take it you're agreeing with my hypothetical, that if it's the next-door neighbor over to feed the cat, they don't have the authority to consent to let the police into the house. They have no interest in the house whatsoever. That's correct, but I would also say that, if we play that scenario out, the next-door neighbor who's just feeding the cat is likely to, when DEA agents arrive at her door, say, I don't live here, right? Or, you know, because they show up and say, we just arrested. Why isn't the burden on the police, though, to have just a brief exchange to validate their right to enter the home, which the Supreme Court always tells us is the paragon of Fourth Amendment-protected places? Well, the burden is on establishing by preponderance that it was reasonable for them to believe, at that point in time, that she had mutual use and access and control of the apartment, looking at the totality of the circumstances. And they know she's wearing a bathrobe. Right. Okay, we got the bathrobe column checked off. But in terms of, you know, what their expectation is, in the scenarios that have been brought forward, if we're playing that out in real life, I mean, if someone came over to feed the cat, and the DEA shows up and says, can we go into this person's apartment, it's reasonable to assume that that person would say, at a minimum, like, I guess you can go in here, but just so you know, I don't live here, right? That's reasonable for them to assume. Or they might say, what do I care? I mean, they might. Maybe. But, again, if we're dealing with, like, real life and what's really playing out here, in these other scenarios, it's likely that that person is not going to just say, yes, come on in, without hesitation, without disclaiming any connection. The DEA wants to search this apartment. At a minimum, you might think the person would want to distance themselves from whatever it is the DEA is looking for in an apartment that they just, you know, wandered over to feed the cat, right? So in terms of what's reasonable for the agents to expect to be the case, their assumptions here are reasonable. And when we get to the point at which a defense counsel refers to, at the point where she says that she resides elsewhere, it's important to note that in that same conversation, that's when she says, my son lives here. So at that point, they're in the house with Mom. And they've just seen Dad, the defendant, take their son to school. But they didn't know it was Mom when she answered the door. No, no. I agree. Which would be totally different. If they had known that that was Mom, that would be different.  There's a time difference in terms of the level of analysis. I was just addressing the issue that was raised by defense counsel. But I think, you know, in that initial stage, when they show up and knock on the door, the way she's dressed, they think reasonably. And people can disagree about, you know, what we think might be the case. But it was reasonable for them to make that assumption at that point in time. There's a just case on apparent authority when there's no verbal exchange about the person's association with the house. Apparent authority just inferred from the Senate affair. Where there's not a, I mean, this court has found authority in cases where people initially say they don't live there. I mean, where. I suppose there's no conversation. The police are just looking around. Is there any case that's gone as far as you're trying to push it here? A case where there's no question as to whether or not the person resides there, you mean? We don't know anything. It's a human being who opens the door, garbed in a certain way. And the police figure, ah, we're in. There are cases, I mean, there are a number of cases where there's some facts similar to that. But there would be other facts at play. The courts have said you need to have some investigation, some follow-up. By which I mean conversation. I don't mean, you know, running around, dusting things. I'm not sure there's a case that's directly analogous to what we have here. Other than Koss, which goes the other way. I'm sorry? The United States against Koss case, which goes the other way. I'm not familiar with that. To the Tenth Circuit case. I wasn't familiar with that case. I see that my time is up. If the Court has any other questions. Or if you don't have any other questions. We're getting close, but yeah, go ahead. That this Court affirm the defendant's conviction and sentence in the case. All right, thank you very much. Anything further, Mr. Thompson? If the Court has any questions, I'd be happy to answer them. Otherwise, I ask that the conviction be overturned and remanded. I see no questions, so thank you very much. Thank you. Thanks, of course, to the government. We'll take the case under advisement, and the Court will be in recess.